## IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| **ALFRED CONYERS, JR.,** | ) | **Civil Case No. 2:14-cv-0437-RBH-MGB** |
| | ) | |
| **Claimant,** | ) | |
| **v.** | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

Alfred Conyers, Jr., through counsel, brought this action to obtain judicial review of an unfavorable final administrative decision denying benefits on his applications for Title II ("DIB") and Title XVI ("SSI") benefits under the Social Security Act ("SSA"). See Section 205(g) of the SSA, as amended, 42 U.S.C. Section 405(g). This matter was referred to the Magistrate Judge for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28, United States Code, Section 636(b)(1)(B). Having carefully considered the parties' briefs, the administrative record, and applicable authority, the undersigned recommends that the Commissioner's final decision be **reversed and remanded** pursuant to Sentence Four, based upon the following proposed findings of fact and conclusions of law:

## I.  Relevant Statutory Law

The SSA provides that disability benefits are available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). For purposes of the statute, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). As the Commissioner correctly indicated, the Social Security regulations set forth a five-step sequential process that takes into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition. 20 C.F.R. § 404.1520. The Fourth Circuit Court of Appeals has succinctly stated that, to be entitled to benefits, "[t]he claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity ["RFC"] to (4) perform [the claimant's] past work or (5) any other work." *Albright v. Comm'r*, 174 F.3d 473, 475 n. 2 (4th Cir. 1999). The claimant bears the burden of production and proof through the fourth step. "If the claimant reaches step five, the burden shifts to the government" to provide evidence that other work exists in significant numbers in the national economy that the claimant can do. *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). In the present case, the ALJ determined that the claimant was not disabled at the fifth step of the sequential process.

## II.   Factual Background and Procedural History

The relevant facts will be briefly summarized: Claimant was born February 23, 1971 ("younger"), has a "limited" education, communicates in English, and lives with his wife and two teenage children. He has substantial past relevant work experience as a utility worker and materials handler ("semi-skilled, heavy"),  crane operator ("semi-skilled, medium"), woodcutter ("semi-skilled, medium"), parts inspector ("semi-skilled, light"), and flagger ("unskilled, light"). (AR 28-29, 51). He has no history of substance abuse (other than formerly smoking) and no mental impairments.

On August 11, 2012, Mr. Conyers (age 41 years old) was admitted to the hospital with acute pancreatitis and acute respiratory failure. He was admitted to the Surgical Trauma Intensive Care Unit (STICU) in critical condition. (TR 291, 298-99). During efforts to resuscitate him, he developed tachycardia (abnormally rapid heart rate) and "abdominal compartment syndrome." (AR 290, 368, 376).[1] He was intubated and placed on a ventilator. He underwent multiple surgeries, including emergency abdominal decompression for his distended abdomen. (AR 299, "upon entering the abdominal cavity, approximately 1 L of green purulent-appearing ascites [fluid in the peritoneal cavity] was able to be aspirated out of the abdomen," 368-371). He required multiple abdominal washouts, drain placements, a chest tube placement, and a tracheotomy. (AR 41, 537-697). He suffered various complications and had episodes of tachycardia throughout his hospitalization. (AR 370). He developed an anti-biotic resistant ("vancomycin-resistant enterococcus") infection. Claimant is obese (242 lbs. at height 5'6', with a body mass index of 39.1) and has diabetes. (AR 40).

After a month in intensive care, he was transferred to the regular patient ward on September 11, 2012. He had further complications when he developed an abscess in his scrotum (described as a "golfball-sized mass") which required drainage and irrigation. (AR 434). He also developed a large retroperitoneal abscess and suffered nausea and vomiting. (AR 370). He had pancreatic necrosectomy surgery on October 25th for removal of infected/necrotic tissue and drainage of the retroperitoneal abscess. (AR 370). Although several drains were surgically placed in his abdomen, a CT scan on November 6, 2012 showed the continued presence of persistent fluid, as well as inflammatory tissue along the left abdomen, pelvis and extending into the left

---

[1] Abdominal compartment syndrome is a potentially life threatening condition in which excessive pressure builds up in the abdomen. See www.webmd.com; and see, e.g., *Weaver v. Univ. of Pittsburgh Med. Center*, 2008 WL 2942139, *1 (W.D.Pa.) (describing it as "a severe increase in the pressure within the abdomen such that a patient's internal organs begin to fail and malfunction. Untreated, this medical emergency has a high mortality rate. Treatments include sedation, stomach tubation to remove fluid and air, abdominal tubation to remove fluid or blood, and opening the abdomen to reduce the pressure.").

inguinal canal. (TR 374 – 375). He was hospitalized for a total of three months and had fourteen significant surgeries during that time.

He was deemed safe to discharge on November 7, 2012, in "stable" condition. (AR 646-51 Discharge Summary). Discharge medications included metformin, metoprolol, oxycodone, Colace, MS Contin, amlodipine, and atorvastatin. (TR 368 – 373). He required significant medication for pain, and his treating physician, Dr. Stephanie Montgomery, M.D., prescribed Oxycodone 5 mg immediate release every four hours as needed. His discharge instructions indicate he should not drive or operate machinery when taking narcotic medications, and that he should continue to have follow-up care for his open wound and diabetes. (AR 372). His abdomen was still distended, but nontender. He required abdominal wound dressing changes with Xeroform and ABD pads, and had to use an abdominal binder when out of bed. He was instructed to change the dry dressings twice a day as needed.

The record reflects various follow-up doctor visits and nurses' notes indicating slow progress and some problems with the healing of his open abdominal wound. His ventral hernia could not be repaired until the open abdominal wound had fully healed.[2] On January 13, 2013, treating physician Dr. Montgomery provided a brief (one paragraph) letter indicating that Mr. Conyers would be scheduled for repair of the ventral hernia after his open wound had healed. (AR 523). No date was specified, although she referenced "the near future." Dr. Montgomery indicated he may "ambulate as tolerated" and should not lift more than 15 lbs., and noted that

---

[2] Ventral hernias are a type of abdominal hernia that can develop where an incision was made during an abdominal surgery, occurring when the incision doesn't heal properly. See www.uscfhealth.org ("Ventral hernias cause a bulge or lump in the abdomen, which increases in size over time. In some cases, the lump may disappear when you lie down, and then reappear or enlarge when you put pressure on your abdomen, such as when you stand, or lift or push something heavy."). See also, www.openabdomen.org (observing the the condition is "associated with high morbidity and mortality rates, often preclude definitive closure and necessitate the surgical creation of an 'open abdomen.' More often than not, huge hernias result necessitating expensive reconstructive procedures that may leave the patient with a less than an optimal outcome.").

such restriction would remain in effect until surgical hernia repair and 6 weeks of recuperation. (AR 523).[3]  He continued to receive home health nursing care (nurse visits twice weekly) for his open abdominal wound, destructive peritoneal tissue, retroperitoneal abscess, and diabetes until May 2013. (AR 462-514, 646-697).

While he was hospitalized in the ICU, his wife (on his behalf) protectively filed on August 22 and 25, 2012, respectively, applications for DIB and SSI benefits, asserting disability as of August 11, 2012, due to necrotizing pancreatitis, respiratory failure, anti-biotic resistant infection, and abdominal compartment syndrome (AR 22, 128, 187-96, 221). The applications were denied initially and on reconsideration, because his condition was "not expected to remain severe enough to prevent you from performing all types of work for 12 months in a row." (AR 75-78, 90).

Upon request, Administrative Law Judge Ronald Sweeda ("ALJ") held a hearing on June 20, 2013, at which the claimant (represented by counsel) and a vocational expert ("VE") both testified. At the hearing, claimant's counsel asked the ALJ to view the claimant's open abdominal wound (which had still not fully healed) because it was "worse than could be comprehended from reading." (AR 43, indicating the claimant has a 10 x 8 inch gauze covering a triangular wound approximately 5" x 8" x 8"). Claimant testified that his wound was taking a long time to heal, possibly due to his diabetes, and that he still could not have surgery to repair the ventral hernia.[4] He indicated his blood sugar had been elevated (as high as 450-500) on a regular basis, that he had seen his doctor that week, and that the doctor advised he may have to go on insulin. He indicated they had already upped his "Metformin" but his blood sugar level

---

[3] At the administrative hearing six months later in June 2013, the open abdominal wound had still not healed, and the ventral hernia could still not be repaired.

[4] The claimant's medical records reflect slow healing of this abdominal wound. See also, www.ncbi.nlm.gov/pmc (observing that "perfusion of the abdominal wall may be decreased, so that wound healing may be impaired").

was still high. (AR 44). He testified that due to his open abdominal wound and hernia, he cannot sit for long because he gets "cramped up" and has to get up and move around. (AR 45, estimating he could sit 30-40 minutes and stand 15 minutes). He explained that he cannot bend over to put on shoes or socks, can't reach anything below his knees, and requires assistance to dress and shower. (AR 47). He indicates he has some side effects from medication, including diarrhea from the Meformin/diabetes medicine. (AR 44). He testified that he has some joint pain as well. He testified that if his wound would heal and his hernia could be repaired, he would like to return work as a crane operator when able. (AR 50).

The ALJ posed a hypothetical question to the VE based on the following RFC: the person is able to perform "light" work, except his lifting is limited to 15 pounds; can occasionally kneel, crouch, crawl, and stoop; no bending such that the hands would not go beyond knee level,  i.e., a 45 degree angle. (TR 51 − 53). The VE testified that several jobs could be performed with those abilities, including "quality control types of positions … representative DOT would be 732.587-014" and "some personal service occupations … representative DOT would be 758.677-010." (TR 53-54). The ALJ issued a decision finding that claimant was not disabled from the alleged onset date August 11, 2012 through the date of decision on July 19, 2013. (AR 22-30). The Appeals Council denied review, and the ALJ's decision is the Commissioner's final decision.

## III.  Standard of Review

The SSA limits this Court's review of the Commissioner's final decision to: (1) whether substantial evidence supports such decision; and (2) whether the Commissioner applied the correct legal standards. 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (quoting *Perales*, 402 U.S. at 401). It is "more than a mere scintilla but less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 637–38 (4th Cir. 1996).

## IV.   Arguments Presented

The claimant argues that: 1) the ALJ failed to fully develop the record; 2) the ALJ's decision is based on speculation regarding possible improvement that had not actually occurred; 3) the ALJ failed to find that several impairments were "severe" at step two; 4) the RFC is inadequate and inconsistent with the medical record; 5) the ALJ improperly discounted the claimant's credibility; and 6) the ALJ erred in relying on the VE's testimony. (DE# 15).

The Commissioner responds that: 1) there was no failure by the ALJ to develop the record; and 2-6) substantial evidence supports the the findings of the ALJ. (DE# 17).

## V.   Discussion

First, to determine whether the ALJ fully and fairly developed the record, the court must ask whether the record contained sufficient evidence for him to make an informed decision. See 20 C.F.R. §§ 404.1513(e), 416.913(e) ("The evidence in your case record … must be complete and detailed enough to allow us to make a determination or decision about whether you are disabled"). The claimant's present counsel points out that the ALJ made no attempt to obtain and consider available current medical evidence. Despite the hundreds of pages of documents reflecting the numerous surgeries and extensive care received by the claimant, the ALJ did not obtain any current medical information. The ALJ must develop a plaintiff's complete medical history for at least the twelve months preceding the month of that plaintiff's application and must assist the plaintiff in obtaining medical reports from his doctors. 20 C.F.R. § 404.1512(d).

Development of the record may include ordering consultative examinations "when evidence as a whole, both medical and nonmedical, is not sufficient to support a decision," 20 C.F.R. § 404.1519a(b). No consulting examination was sought. The testimony and evidence at the hearing confirmed that the claimant still had an open abdominal wound and a ventral hernia that could not yet be repaired. While the medical documentation in this case is extensive (the administrative record exceeds 700 pages), the more recent documentation is not sufficient to make a determination regarding whether the claimant met the duration requirement for disability. The "expected" duration was apparently the main reason his claim was initially denied. There is no question that Mr. Conyers suffered lengthy hospitalization and is still recuperating and awaiting further surgery. At the hearing, the fact that claimant's wound was still open and his ventral hernia had still not been surgically repaired should certainly have signaled to the ALJ that further information was needed. *Cooley v. Colvin*, 2015 WL 1518096, *23 (D.S.C.) (remanding for failure to adequately develop the medical evidence).

The Fourth Circuit Court of Appeals has held that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *see also, e.g., Kersey v. Astrue*, 614 F.Supp.2d 679, 693–94 (W.D.Va. 2009) (observing that the medical evidence must be "complete enough to make a determination regarding the nature and severity of the claimed disability, the duration of the disability and the claimant's residual functional capacity."). "Where the ALJ fails in [the] duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). The claimant accurately points out that the ALJ's decision is based on

speculation regarding possible improvement in the claimant's condition that had not actually occurred. Under the regulations, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added). Here, the claimant's condition had already lasted almost eleven months – approximately August 2012 to July 2012. The claimant's abdominal wound remained open and was not fully healed, and his ventral hernia could not yet be repaired. If and when the ventral hernia is repaired, the treating physician indicated another six weeks of convalescence would be required. Contrary to the Commissioner's decision, the record suggests that the claimant's condition "can be expected to last for a continuous period of not less than 12 months." Remand is appropriate here.

Secondly, the claimant asserts that the ALJ failed to find that several of claimant's impairments were "severe" at step two. The ALJ found that claimant had "severe" impairments due to status post-necrotizing pancreatitis, obesity, and ventral hernia (Finding 3), but that his "obesity, scrotal abscess, diabetes, hyperlipidemia, and hypertension" were controlled with medication or other conservative measures and did not result in any limitation of his ability for basic work-related activities.[5] In other words, he found the latter conditions to be non-severe. His discussion of the non-severe impairments is minimal and conclusory. (AR 24-25).

With respect to diabetes, the claimant testified that his blood sugar had recently been at elevated levels (as high as 450-500) on a regular basis, that his doctor had increased his Metformin but his blood sugar was still high, and that his doctor had indicated the claimant may have to go on insulin. (AR 45). The ALJ did not account for this and did not point to any

---

[5] Hyperlipidemia involves abnormally elevated levels of lipids and/or lipoproteins in the blood, and can be genetic or acquired in origin. Aquired hyperlipidemia arises when another underlying disorder, such as diabetes, leads to alterations in plasma lipid and lipoprotein metabolism. Some forms may predispose to acute pancreatitis. See www.wikipedia.org.

evidence suggesting that claimant's diabetes was currently "controlled with medication." The ALJ did not explain or point to any medical findings indicating that claimant's diabetes did not affect his ability to perform basic work-related activities. His finding is essentially conclusory.

With respect to obesity, the ALJ recited the relevant law indicating that he should consider it in combination with other impairments. Review of the ALJ's decision, however, reflects that it contains much standard recitation, but very little explanation of any actual facts to support the finding. (AR 25). SSR 02–01p sets forth the SSA's policy on obesity and provides that, even though obesity is no longer classified as a listed impairment, adjudicators must still consider its effects when evaluating an individual's RFC. SSR 02–01p, 2002 WL 34686281, at *1. The Ruling explains that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time ... [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. *Id*. at *6.

An ALJ must "adequately explain his or her evaluation of the combined effects of [a claimant's] impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989); *Reid v. Comm'r*, 769 F.3d 861, 866 (4th Cir. 2014) (finding that ALJ specifically considered the cumulative effects of all the impairments, including obesity, on claimant's ability to work); *Nejat v. Comm'r*, 359 Fed.Appx. 574, 577 (6th Cir. 2009) (holding that ALJ must "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."); *see also, Saxon v. Astrue*, 662 F.Supp.2d 471, 479 (D.S.C. 2009) (collecting cases that describe the importance of analyzing a claimant's impairments both separately and in combination).

In the present case, the ALJ's decision does not reflect sufficient explanation of how he considered the claimant's obesity for purposes of SSR 02-01p. The ALJ's decision does not demonstrate that he appropriately considered the plaintiff's obesity and the extent to which his obesity, in combination with other impairments, limited his overall functional ability.

Third, the claimant correctly asserts that the ALJ's decision does not sufficiently explain the basis for how he arrived at the claimant's RFC. Claimant asserts that the ALJ's RFC assigned to the claimant is "inadequate" and "inconsistent with the medical evidence." On the facts of this case, the ALJ's failure to perform this analysis requires remand.

Residual functional capacity ("RFC") is defined as "the most [one] can do despite [one's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). More specifically, RFC is a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p. The Ruling explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." (*Id.*). The Fourth Circuit has held that "remand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013); see also, e.g., *Neely v. Comm'r,* 2015 WL 3536690, *12 (D.S.C.) (J. Wooten); *Washington v. Colvin,* 2015 WL 3868063, *29 D.S.C.) (J. Hendricks).

In the present case, the ALJ decided that the claimant had the RFC to perform a limited range of light work,[6] could not lift more than 15 pounds, and can occasionally kneel, crouch, crawl, and stoop, with no bending beyond a 45 degree angle. (AR 26, Finding 5). He provided little relevant discussion as to how he reached these conclusions, other than to refer to Dr. Montgomery's letter indicating a 15 lb. lifting restriction (which he gave "significant weight"). The ALJ states in his decision: "The above RFC eliminates severe bending and is generally consistent with the opinion of Dr. Montgomery. Of particular note is that the claimant's extreme bending limitation will be eliminated when his abdominal wound heals." (AR 27). Again, this is rather conclusory and not helpful for analysis. Although the ALJ briefly noted that claimant's open wound was "decreasing in size" (AR 27), this does not address the functional abilities of someone with such a condition. Moreover, claimant points out that his wound had *not* yet healed and that his ventral hernia had *not* yet been repaired, and that his doctor indicated he would need six weeks of recuperation afterwards. The ALJ also did not discuss the claimant's ability to "push and pull" in light of his open abdominal wound and unrepaired ventral hernia, nor did the ALJ assign, discuss, or indicate that he considered, any appropriate environmental restrictions for an individual with an unhealed open wound. See 20 C.F.R. § 416.945(b)-(d).

In his decision, the ALJ provided little or no relevant explanation for his conclusion that the claimant could "occasionally kneel, crouch, crawl, and stoop." "Occasionally" means "occurring from very little up to one-third of the time." SSR 83–10. At the hearing, the ALJ asked the VE to assume a limited degree of stooping or bending, specifically "limit bending so

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b) (explaining that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

that hands when extended directly downward, would not go beyond knee level." (AR 52, "boy, I'm going way off the DOT on this one"). The VE testified that the assembler and flagger positions would be eliminated because "the reality of that kind of job is, you have to bend over. You have to pick things up. If you drop something, you have to reach. There's going to be more than what Your Honor is describing as a slight bend." (AR 52). The VE then testified that "stooping" was defined as "bending at the waist" (AR 52).[7] The VE further explained that "as a practical matter you can't just stand there the whole time." (AR 53).

Social Security Ruling 96-9 at *8 explains that:

> An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work.

After the VE identified several "light" jobs under a hypothetical question (which the claimant asserts did not accurately represent his abilities), the ALJ commented that "it's a foregone conclusion that a person who can perform light work can perform sedentary work, so there would be sedentary positions consistent with that?" (AR 54). The VE cautioned that "as far as bending, of course, if someone is seated, they're bent at the waist." The ALJ dismissed this concern. (AR 54). The VE also correctly cautioned that an inability to stoop "severely restricts the range of jobs" and "seriously erodes the base." (AR 54-55). After being interrupted several times, the VE finally managed to state that an inability to stoop would limit the jobs "to less than an insignificant number." (AR 55). Here, the claimant testified that he could not bend over to put shoes on or reach past his knees.

---

[7] The transcript of the hearing reflects that the ALJ repeatedly interrupted the testimony of the VE and the claimant, and interfered with their answers. (See e.g., AR 42, 52-56). At any subsequent hearings, the ALJ should be careful to allow witnesses to finish their testimony.

The Commissioner is required to provide more than a bare conclusion when making findings of fact and decisions as to the rights of individuals applying for disability. The Social Security Act requires the following:

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for payment under this title [42 USCS §§ 401 et seq.]. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based ...

42 U.S.C. § 405(b)(1). Without an appropriate analysis by the ALJ, the Court cannot effectively evaluate whether the ALJ's decision is supported by substantial evidence. Remand is appropriate.

## VI. Conclusion

On remand, the ALJ should further develop the record, explain the evidentiary basis for finding any impairments to be non-severe, discuss the severe and non-severe impairments in combination, and fully explain the function by function analysis required for an adequate RFC determination. Additional development of the record and reconsideration of the above issues will impact the claimant's remaining claims. Given the need for remand on several grounds discussed above, analysis of the claimant's remaining contentions is not necessary at this time.

## <u>RECOMMENDATION</u>

Accordingly, the Magistrate Judge **RECOMMENDS** that the Commissioner's final decision be **REVERSED** pursuant to Sentence Four of 42 U.S.C. § 405(g) and **REMANDED REMANDED** to the Commissioner for further proceedings.

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE